FILED
United States Court of Appeals
Tenth Circuit

May 7, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FEDERAL TRADE COMMISSION;
STATE OF KANSAS; STATE OF
MINNESOTA; STATE OF NORTH
CAROLINA; STATE OF ILLINOIS,

        Plaintiffs - Appellees,

v.

MEGGIE CHAPMAN, individually and
d/b/a Meggie Chapman & Associates,

        Defendant - Appellant,

and

WEALTH POWER SYSTEMS, LLC;
ARIA FINANCIAL, LLC,

        Defendants.

No. 11-3319

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 5:09-CV-04104-JAR)**

---

M. Courtney Koger of Kutak Rock LLP, Kansas City, Missouri, for Defendant - Appellant.

Michael D. Bergman, Federal Trade Commission, Washington, D.C. (Gary L. Ivens, Janice Kopec, and Michael Tankersley, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C., of counsel; Willard K. Tom, General Counsel, and John F. Daly, Deputy General Counsel for Litigation, Federal Trade Commission, Washington, D.C.; Clifford W. Berlow, Assistant Attorney General, Office of the Attorney General for the State of Illinois, Chicago, Illinois; Steve R. Fabert, Assistant Attorney General, Office

of the Attorney General for the State of Kansas, Topeka, Kansas; Jocelyn F. Olson, Assistant Attorney General, Office of the Attorney General for the State of Minnesota, St. Paul, Minnesota; and David N. Kirkman, Assistant Attorney General, Office of the Attorney General for the State of North Carolina, Raleigh, North Carolina, with him on the brief) for Plaintiffs - Appellees.

---

Before **O'BRIEN, McKAY,** and **TYMKOVICH,** Circuit Judges.

---

**McKAY**, Circuit Judge.

---

This appeal arises from a bench trial in which the district court found that Appellant Meggie Chapman violated the "assisting and facilitating" provision of the Telemarketing Sales Rule, 16 C.F.R. § 310.3(b).

The underlying consumer protection action was brought by the Federal Trade Commission and four states against several individual and corporate defendants who marketed and sold to consumers grant-related goods and services with false representations that the consumers were guaranteed or likely to receive grants. After the claims against the other defendants were settled or adjudicated by entry of summary judgment, the district court held a bench trial on the remaining claim against Ms. Chapman. Following the trial, the court found that Ms. Chapman violated the Telemarketing Sales Rule by providing substantial assistance to the telemarketing defendants while knowing or consciously avoiding knowing of their deceptive telemarketing practices. The court accordingly ordered a permanent injunction and $1,682,950 in monetary damages against Ms. Chapman. The court also denied Ms.

Chapman's post-judgment motion to alter or amend the judgment or, alternatively, for remittitur. Ms. Chapman appeals both the finding she violated the Telemarketing Sales Rule and the denial of her post-judgment motion.

## BACKGROUND

Beginning in 2007, the Kansas defendants—various individuals and corporations based in Kansas—began selling grant-related services through telemarketers to consumers throughout the United States. Their telemarketing scheme involved three stages. First, they sent consumers postcards advertising the availability of government grants and inviting consumers to call a toll-free number. Consumers who called the number were offered the opportunity to purchase for $69 a book called the "Professional Grant Writer," referred to in this litigation as the "Grant Guide," which had been written by Ms. Chapman and another individual. This book contained a misleading statement regarding the defendants' grant-writing success rate. The postcards and the recorded message at the toll-free number also contained misrepresentations about the likelihood the consumer would receive government grant money. In fact, none of the defendants tracked whether customers who purchased their goods or services actually received grants.

In the second stage of the scheme, individuals who had called about or purchased the Grant Guide received additional calls advertising grant-research services. Consumers who purchased these services were charged between $800 and $1100, and in return they received a list of potential funding sources. Many of these lists were prepared by Ms.

Chapman or her company, and many of them included institutions that did not fund individual consumers, did not provide monetary funding, did not exist, or had requested removal of their names from the lists. Ms. Chapman's research lists frequently included loans, contests, entitlement programs, and social welfare programs for which the consumer was not eligible or which did not fit the needs identified by the consumer. Prior to working with the other defendants, Ms. Chapman had only performed grant research for educational institutions and nonprofit organizations, not individual customers, and she had never before worked with telemarketers. The telemarketing sales script for the defendants' grant-research services included misrepresentations about the defendants' expertise and the consumers' likelihood of receiving grant funding. The research cover letters sent to consumers discussed what would happen "in the rare event that you don't meet the criteria for any grant applications" and stated the research results "will contain a list of grants you are eligible for." J.A. at 729. Ms. Chapman sometimes received these cover letters when the other defendants sent her consumer information and research requests.

Finally, in the third stage of the scheme, individuals who purchased grant-research services received telemarketing calls about grant-writing and grant-coaching services. Ms. Chapman was involved in providing both grant-writing and grant-coaching services for consumers from early 2008 through July 2009. The grant-coaching services included a written workshop in which Ms. Chapman was identified as an instructor for Grant Writer's Institute, one of the main Kansas defendants.

Ms. Chapman also assisted the other defendants in various ways. At the other defendants' request, Ms. Chapman researched payment processing companies, collected consumer testimonials for the defendants' website, edited some of the website content, gave the defendants a price quote for research services for international consumers, gave them a price quote and sample content for a proposed newsletter, and provided them with a bullet-point list of the purported benefits of using a grant writer. She also helped prepare a draft of a questionnaire for the Kansas defendants and their telemarketers to use to collect information from grant-research consumers, and she trained a telemarketing sales group on the information needed to process research requests.

Ms. Chapman came up with the idea to include contests in the research results. One of the Kansas defendants subsequently asked her to "write a short paragraph or one page, on or about what a contest really is and how it is still considered a grant" for the defendants to include in the research results "so people have a better understanding about the contests and that will answer some of their questions before they call in." J.A. at 1110. In response, she sent him a "blurb on contests," stating, "I wrote it for the target audience so if it is too cheesy, please let me know." J.A. at 1108. Among other things, the response stated, "Hot off the presses [Kansas defendant Grant Writer's Institute] wants to tell you about **a new trend** that can be very fruitful—**contests and sweepstakes**. Yes, these are all considered grants!" J.A. at 1108 (bolding in original). The response further included a "sampling of grants available to individuals," including contests, sweepstakes, assistance programs, entitlements such as Medicare and Medicaid,

scholarships, and loans. J.A. at 1108-09. In February 2009, Ms. Chapman sent the Kansas defendants an email in which she stated, "I have been brainstorming ways that we can expand as well as repackage what we are currently doing to appeal to all parties." J.A. at 1106. Ms. Chapman came up with an idea for the defendants to sponsor a quarterly grant contest in order to generate more consumer leads, although the Kansas defendants did not ultimately implement this or some of Ms. Chapman's other ideas.

Ms. Chapman also helped the other defendants respond to inquiries from various state attorney general offices. For instance, when she began working with the Kansas defendants, she was told a state attorney general's office "wanted to know who was doing the research just to ensure that there were actual people performing the research," and she provided the defendants with a few individuals' names to pass on to the state attorney general. J.A. at 2619. Later, Ms. Chapman was informed the state attorneys general of North Carolina and Alaska needed to see that individual grants existed, and she assisted the defendants by compiling a list of grants for which individuals could allegedly apply.

By mid-2009, approximately 80-90% of Ms. Chapman's business came from the Kansas defendants. Between January 2008 and June 2009, Ms. Chapman billed for a total of 8361 grant-research consumers. She did not track whether any of these consumers actually received a grant. She testified she did not feel the need to track the consumers' success because they were not her clients—she was only "hired to do the fulfillment for them," i.e., to fulfill the grant-related services sold to these consumers by the other defendants. J.A. at 1331. In total, Ms. Chapman received $1,682,950 from the

Kansas defendants for services she and her company provided from 2007 through 2009.

When the Kansas defendants were listed in the original FTC complaint in July 2009, Ms. Chapman began working for certain Utah-based telemarketers. She did not review these companies' marketing materials or telemarketing scripts to see if they suffered from the same problems alleged in the FTC action against the Kansas defendants. These Utah companies—as well as Ms. Chapman—were subsequently named in an amended FTC complaint in December 2009, and Ms. Chapman then began working for another Utah company she knew was controlled by the owners of one of the Utah defendants. At the time of her September 2010 deposition, Ms. Chapman was still providing fulfillment services for this company. She testified again she did not review this company's marketing materials or telemarketing scripts. When asked if she "want[ed] to know what [the company was] sending out to consumers," Ms. Chapman replied, "You know, I really hadn't thought about it." J.A. at 1378.

Following a two-day bench trial, the district court found that Ms. Chapman had violated 16 C.F.R. § 310.3(b), which provides:

> It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

The district court rejected Ms. Chapman's arguments that she did not provide substantial assistance to the Kansas defendants and that she did not know or consciously avoid knowing of their misrepresentations to consumers. The district court accordingly issued a

permanent injunction against Ms. Chapman and ordered her to pay $1,682,950 in monetary damages. Ms. Chapman filed a motion to alter or amend the judgment or, alternatively, for remittitur, seeking a reduction in damages. The district court denied this motion, holding that the damages award was not clearly erroneous or manifestly unjust and that remittitur was not appropriate. This appeal followed.

## DISCUSSION

On appeal, Ms. Chapman challenges the district court's finding that she violated the Telemarketing Sales Rule. She also challenges the district court's denial of her post-judgment motion to alter or amend the judgment or for remittitur. "We review the district court's legal conclusions in a bench trial de novo; findings of fact will not be set aside unless clearly erroneous." *Ryan v. Am. Natural Energy Corp.*, 557 F.3d 1152, 1157 (10th Cir. 2009). We review for abuse of discretion the district court's denial of Ms. Chapman's post-judgment motion to alter or amend the judgment or for remittitur. *See Monge v. RG Petro-Mach. (Grp.) Co. Ltd.*, 701 F.3d 598, 610 (10th Cir. 2012) (motion to alter or amend); *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009) (motion for remittitur).

## I. Violation of the Telemarketing Sales Rule

Under 16 C.F.R. § 310.3(b), it is a violation of the Telemarketing Sales Rule "for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule." In this

case, it is undisputed the Kansas defendants violated § 310.3(a)(2) by misrepresenting material aspects of the grant-related goods or services they sold. Thus, the only disputed issues are (a) whether Ms. Chapman provided substantial assistance to the Kansas defendants and (b) whether Ms. Chapman knew or consciously avoided knowing of their misrepresentations.

## A. *Substantial assistance*

Although the parties do not dispute the general standard of review stated above, they disagree as to how this general standard of review applies to the specific issue of substantial assistance. Ms. Chapman argues that, although the district court's underlying factual findings are reviewed for clear error, the district court's ultimate determination that she provided substantial assistance to the Kansas defendants is a legal conclusion we review de novo. Plaintiffs disagree, arguing this determination was either a factual finding or a mixed question of law and fact that we review for clear error. Neither side cites to authority directly on point. We need not resolve this dispute here because we would affirm under either standard of review.

As detailed above, Ms. Chapman played an integral part in the Kansas defendants' telemarketing scheme. She coauthored the book that was sold in the first stage of the scheme, she provided the research results—often flawed—that were marketed in the second stage of the scheme, and she wrote grant applications and developed the workshop marketed in the third stage of the scheme. She also assisted the Kansas defendants in numerous other ways: helping develop the questionnaire the telemarketers used to obtain

-9-

information from grant-seeking customers; training a sales group on processing grant research requests; assisting in responding to inquiries from different state attorneys general; providing the Kansas defendants with justifications and explanations to deal with consumer complaints; brainstorming ways for them to collectively expand their business; and so forth.

Ms. Chapman argues her actions did not constitute substantial assistance under the Telemarketing Sales Rule because she was not involved in the marketing efforts and thus her assistance was not directly connected to the misrepresentations made to consumers. However, this type of direct connection is not required. Although the originally proposed rule would have applied only where "such substantial assistance is related to the commission or furtherance of that act or practice," Revised Notice of Proposed Rulemaking, Telemarketing Sales Rule, 60 Fed. Reg. 30,406, 30,414 (June 8, 1995), the FTC rejected this requirement in the final rule, *see* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995). As the FTC's published guidance states, the substantial assistance standard will not be met if the third party provides only "casual or incidental" help to the telemarketer. *FTC, Complying with the Telemarketing Sales Rule*, *available at* http://business.ftc.gov/documents/bus27-complying-telemarketing-sales-rule#assisting (Feb. 2011). Thus, "cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be enough to support liability as an assistor or

facilitator." *Id.* However, Ms. Chapman's assistance was much more than casual or incidental—she was the one who provided the services and products they marketed to consumers in misleading ways.

Ms. Chapman also argues that she could not have provided substantial assistance because she did not engage in any of the specific examples of substantial assistance listed in the FTC's published guidelines or discussed in previous cases. For support, she cites to an FTC statement that provides an illustrative, non-exclusive list of ways in which third parties may provide substantial assistance to telemarketers. *See* Statement of Basis, 60 Fed. Reg. at 43,852. She also cites to cases finding substantial assistance under the Telemarketing Sales Rule under different types of factual circumstances. However, the fact that Ms. Chapman's conduct did not fit precisely into the FTC's non-exclusive list or the fact patterns of previous cases does not prevent a finding that she provided substantial assistance to the Kansas telemarketers through her actions. The FTC and courts have not purported to create an exhaustive list of activities that establish substantial assistance, and the law does not provide a special exemption for the first individual to come up with a novel way of assisting telemarketers. It is sufficient that Ms. Chapman played an integral part in the Kansas defendants' scheme by providing the services and products they marketed to consumers. Moreover, Ms. Chapman's conduct is certainly analogous to the example given by the FTC of "a fulfillment house that ships only inexpensive prizes on behalf of a telemarketer about whom it receives numerous complaints" as satisfying the "conscious avoidance" standard. Final Amended Rule, Telemarketing Sales Rule, 68

-11-

Fed. Reg. 4580, 4612 (Jan. 29, 2003). We see no error in the district court's determination that Ms. Chapman provided substantial assistance to the Kansas defendants.

*B. Knew or consciously avoided knowing*

The district court found that Ms. Chapman knew or consciously avoided knowing of the Kansas defendants' misrepresentations to consumers based on several facts: (1) Ms. Chapman knew of inquiries by state attorneys general into the Kansas defendants' marketing practices, which should have put her on notice she should at least investigate these practices; (2) she knew the Kansas attorney general had asked the telemarketers to change the marketing practices used to sell her services, but she never asked to see the marketing materials or telemarketing sales script; (3) she received a request from one defendant's attorney to provide the names of her researchers, since the Kansas attorney general wanted to make sure research was being conducted by "actual people" J.A. at 2619; (4) she was new to the business of researching grants for individuals, and thus should have been more cautious in the face of inquiries suggesting her research results either were not viable or were being inappropriately marketed; (5) she was familiar with the Grant Guide, where a 70% success rate was represented, and she knew this rate was not substantiated; (6) an individual who formerly worked for the Kansas defendants stated she counseled Ms. Chapman to be vigilant about monitoring these defendants' marketing activities; (7) Ms. Chapman sometimes received the consumer cover letter, which contained claims that it was rare for a consumer not to qualify for grants listed in the

-12-

research results; (8) when Ms. Chapman began working with the Kansas defendants, she continued to receive large numbers of grant requests for debt reduction relief after determining such grants were not available, which should have put her on notice that the telemarketers were not accurately informing consumers of the types of grants available; (9) consumer and funder complaints put Ms. Chapman on notice that several grant sources included in her research did not exist or had requirements consumers did not meet; and (10) her testimony about the availability of individual grants was neither substantiated nor credible. Based on all of this evidence, the district court determined that Ms. Chapman knew or consciously avoided knowing that the Kansas defendants were violating the Telemarketing Sales Rule. The parties agree this is a factual finding we review for clear error.

On appeal, Ms. Chapman argues there are several reasons why the district court's determination was clearly erroneous. First, Ms. Chapman argues that some of the district court's underlying factual findings were clearly erroneous. For instance, she argues that the 70% success rate represented in the Grant Guide was not a misrepresentation, since the individual who wrote this portion of the Grant Guide had in fact achieved a 70% success rate in her own work with non-profit organizations and schools. However, particularly in context, the Grant Guide's statement that "historically the grant writers have been able to produce a 70% success rate in receiving grant funding" J.A. at 98 is clearly a misrepresentation. Ms. Chapman likewise argues the district court clearly erred in finding that she knew of several inquiries by state attorneys general, since she only

knew of two such inquiries, her knowledge of these inquiries was limited, and she believed the inquiries had been resolved. We are not persuaded this finding was clearly erroneous. The evidence in the record supports the conclusion that Ms. Chapman knew of at least three inquiries, regardless of whether she thought they had been resolved, and Ms. Chapman cannot demonstrate clear error based simply on the fact that the district court used the term "several" to refer to three inquiries. We are not persuaded any of the district court's underlying factual findings were clearly erroneous.

Next, Ms. Chapman argues that the district court drew incorrect inferences from some of the underlying facts. For instance, she argues that her knowledge of the inquiries by the state attorneys general was too limited to support the inference that she should have looked more closely into the defendants' practices. However, her knowledge that different state attorneys general were inquiring into the defendants' practices is certainly relevant to the question of whether she consciously avoided knowing of their improper marketing practices. Similarly, Ms. Chapman argues the consumer requests for personal debt relief grants do not support the inference that she knew or should have known of the other defendants' misrepresentations, since she stopped receiving such requests at some point after she told the Kansas defendants such grants were not available. Under our deferential standard of review, we are not persuaded the district court drew impermissible inferences from this evidence. This evidence, especially in conjunction with all of the other evidence in this case, supports the inference that Ms. Chapman was put on notice the Kansas defendants might be providing misleading information to consumers. Despite

-14-

these warning indications, Ms. Chapman never asked what the telemarketers were telling customers to encourage them to request nonexistent grants for personal debt relief and to pay $1000 or more on grant-related services they could ill afford. The district court could reasonably infer from this and other evidence that Ms. Chapman consciously avoided knowing of the Kansas defendants' misrepresentations to consumers.

Finally, Ms. Chapman asserts there is no evidence she actually knew of the misrepresentations contained in the Kansas defendants' direct-mail materials and telemarketing sales scripts. However, actual knowledge is not necessary under the "conscious avoidance" standard. Ms. Chapman could easily have reviewed the defendants' marketing materials to see what representations they were making to consumers. Indeed, she testified that she received a telemarketing sales script early in her relationship with the defendants but chose not to review it. As the FTC has explained in its Compliance Guide, "taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability." *FTC, Complying with the Telemarketing Sales Rule*, *supra*. Whether or not Ms. Chapman actually knew of the Kansas defendants' misrepresentations, there is ample evidence in the record to support the district court's finding that she at least consciously avoided knowing of the misrepresentations.

The district court's finding that Ms. Chapman knew or consciously avoided knowing of the Kansas defendants' misrepresentations is supported by the record and is not clearly erroneous. We accordingly affirm the district court's entry of judgment

-15-

against Ms. Chapman for violating the Telemarketing Sales Rule.

## II. Denial of Post-Judgment Motion

Ms. Chapman argues in the alternative that the district court erred in denying her post-judgment motion to alter or amend the judgment or for remittitur. She argues that if she knew or consciously avoided knowing of the Kansas defendants' misrepresentations, this did not occur until some time during the course of their business relationship, and thus the damages award should not have included the entire amount she billed to the Kansas defendants from the start of their relationship.

In denying the post-judgment motion, the district court first noted that a motion to alter or amend judgment under Rule 59(e) may only be granted under certain limited circumstances, such as when there is a "need to correct clear error or prevent manifest injustice." *Monge*, 701 F.3d at 611 (internal quotation marks omitted). Similarly, remittitur is only appropriate if the award is "so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Vining ex rel. Vining v. Enter. Fin. Grp., Inc.*, 148 F.3d 1206, 1216 (10th Cir. 1998) (internal quotation marks omitted). The district court then concluded that Ms. Chapman began receiving indicators of the Kansas defendants' improprieties early on, although she certainly received more indicators later. Based on this conclusion, the district court held that Ms. Chapman had not shown clear error, manifest injustice, or an award of damages so excessive as to shock the conscience.

"[T]he decision to grant reconsideration is committed to the sound discretion of the

-16-

district court," *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 944 (10th Cir. 1995), and denial of a motion for remittitur is likewise reviewed "under a highly deferential standard" under which we will reverse "only if we can discern a manifest abuse of discretion," *M.D. Mark, Inc.*, 565 F.3d at 766 (internal quotation marks omitted).  We are not persuaded the district court abused its discretion by denying Ms. Chapman's post-judgment motion to reduce the amount of damages.  Accordingly, under this deferential standard of review, we affirm the district court's denial of post-judgment relief.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.