FEDERAL TRADE COMMISSION, Plaintiff,

v.

Denny LAKE, et al., Defendants.

Case No.: SACV 15-00585-CJC(JPRx)

United States District Court, C.D. California, Southern Division.

Signed 02/24/2016

John David Jacobs, Federal Trade Commission, Los Angeles, CA, Jonathan A. Cohen, Miriam R. Lederer, Federal Trade Commission, Washington, DC, for Plaintiff.

Sabrina Celia Narain, Thomas John Borchard, Janelle M. Dease, Borchard and Callahan, Mission Viejo, CA, for Defendants.

Denny Lake, Newport Beach, CA, pro se.

### ORDER GRANTING THE FTC'S MOTION FOR SUMMARY JUDGMENT

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

Plaintiff Federal Trade Commission ("FTC") brings this action against Defen-

dant Denny Lake for violations of the Mortgage Assistance Relief Services ("MARS") Rule, 12 C.F.R. § 1015.6, and the Telemarketing Services Rule ("TSR"), 16 C.F.R. § 310.3.[1] Before the Court is the FTC's motion for summary judgment on both counts. For the following reasons, that motion is GRANTED.

## II. BACKGROUND

Defendant Denny Lake claims to have been in the business of assisting distressed homeowners since at least February 2010. (Dkt. 126, "Statement of Plaintiff's Objections to Defendant's Response to Plaintiff's Statement of Uncontroverted Facts" ("UF") 1; 2.)[2] He does business as "JD United" and "the Advocacy Program," (UF 3), and his business model has been to interview homeowners and then file complaints on their behalf with banks, public officials, and other regulatory agencies, in an attempt to get banks to negotiate mortgage modifications for them. (UF 12.) The way that Lake would retain clients was in large part by contracting with other businesses whose clients were distressed homeowners and who would refer those homeowners to Lake for Lake's "advocacy" services. (UF 16.) Lake did not market his services directly to homeowners—the affiliates who sent him clients did that themselves. (UF 14; Lake Dep. at 231:10-13.) Instead, Lake's role was to work with banks on the "back end" to help consumers obtain modifications. (UF 17.)

Federal regulations prohibit third parties like Lake who help homeowners secure modifications from seeking "advance fees." The third parties may only be paid by a consumer after that consumer "has executed a written agreement between the consumer and the consumer's dwelling loan holder"—in other words, after the consumer has successfully obtained a modification from his or her bank. 12 C.F.R. § 1015.5. This regulation and other related provisions are together known as the "MARS Rule." In Lake's experience, the companies who referred clients to him would unlawfully collect advance fees from those clients before paying Lake to process their files and communicate with their lenders. (UF 21.) Lake assumed that if he had been hired to process files, at some point, the company he had contracted with had been paid by the consumer, and he did not work on a consumer file until he was paid to do so. (UF 22; 23.) Despite understanding that advance fees were illegal and that his affiliates were taking them, Lake believed that so long as he was only doing "back-end work"—i.e., not marketing directly to consumers or asking them for advance fees himself—he was shielded from liability under state and federal laws regulating mortgage assistance relief services.

Two of the companies Lake worked with were "HOPE Services" and "HAMP Services," companies or services run by some or all of the "HOPE Defendants"—Brian Pacios, Chad Caldaronello, Derek Nelson, Justin Moreira, C.C. Enterprises, and D.N. Marketing. (UF 42.) Ultimately, Lake signed contracts with both HOPE Services and HAMP Services, and the two sent Lake clients for whom he would do back-end processing work. (UF 42; 73.) He successfully obtained modifications for some, but not all, of the clients he received

1. The remaining Defendants in this case stipulated to liability.

2. The FTC submitted a Statement of Uncontroverted Facts, Lake submitted responses, and the FTC submitted objections to those responses. For simplicity's sake, the Court refers to the facts in Dkt. 126, which contains the original Statement, Lake's responses, and the FTC's objections, as "UF," and notes disputes only when necessary.

from the HOPE Defendants and their companies.

In April 2015, the FTC filed a complaint for a permanent injunction and equitable relief against the HOPE Defendants and Lake. (Dkt. 1 ("Compl.").) The complaint alleges a three-phase scheme on the part of the HOPE Defendants to defraud homeowners. In the first phase, according to the FTC, the HOPE Defendants would mail marketing materials and make unsolicited outbound telephone calls to distressed homeowners, advertising modification services. They would falsely represent to homeowners that they were a government-affiliated nonprofit that could help them obtain loan modifications. When a consumer expressed interest, HOPE Services would request some initial documents and then congratulate the customer on being "preliminarily approved" for a modification. (Compl. ¶¶ 18–28.) In the second phase, the HOPE Defendants and their employees would inform consumers that they were required to pay a "reinstatement fee"—typically a percentage of the past-due amount owed on the consumer's mortgage—and then make three monthly "trial mortgage payments" into their lender's "trust account," which was actually just a HOPE account. (Id. ¶ 31.) The HOPE Defendants would demand "certified funds only" and instruct consumers to make the funds payable to HOPE entities, who sometimes had names styled to resemble the consumer's lender. (Id. ¶ 32.) After a consumer made the first trial payment, the HOPE Defendants would then direct him or her to Lake's "Advocacy Department." The third phase involved Lake: he or one of his employees would contact a consumer, reassure them that the modification process was unfolding (even if the consumer was receiving foreclosure warnings or a sale date was approaching), and generally ask additional financial questions or request additional documentation before "advocating" on the client's behalf to banks or public officials. (Id. ¶¶ 43–49.) The FTC alleges that Lake's role in the scheme was crucial because it kept consumers making "trial payments" to the HOPE Defendants for months longer than they would have otherwise, all the while accruing interest and penalties with their actual lender. (Id.)

Based on these allegations, the FTC brought counts for violations of the MARS Rule and the TSR against the HOPE Defendants, and counts for assisting violations of the MARS Rule and the TSR against Lake. The individual Hope Defendants stipulated to liability and the entry of permanent injunctions against them. (See Dkt. 89 (Caldaronello); 90 (Moreira); 91 (Pacios); and 96 (Nelson).) Lake refused to stipulate, and on May 13, 2015, the Court granted a preliminary injunction freezing Lake's assets and enjoining him from violating the MARS Rule's prohibition against receiving advance fees for modification-related work. (Dkt. 68.) Lake was initially represented by counsel, but after disagreements on strategy and payment (due, apparently in large part, to Lake's asset freeze), his attorneys moved to withdraw. The Court granted their motion on January 15, 2016, and Lake is now appearing *pro se.* The FTC moved for summary judgment on January 11, 2016.

## III. LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249, 106 S.Ct. 2505.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving party's materials are inadequate to establish an absence of genuine

dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position. Fed. R. Civ. P. 56(c)(1)(A)–(B). The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## IV. ANALYSIS

### A. MARS Substantial Assistance Rule

■ In addition to prohibiting certain acts or practices in mortgage servicing, the

MARS Rule, 12 CFR § 1015, prohibits any person from "provid[ing] substantial assistance or support to any [MARS] provider when that person knows or consciously avoids knowing that the provider is engaged in any act or practice that violates this rule." 12 CFR § 1015.6. There are therefore three elements to a violation of the MARS "substantial assistance" rule: (1) an underlying violation of the MARS rule by a MARS provider; (2) substantial assistance or support by a person to that provider; and (3) knowledge or conscious avoidance, on the part of the person, of the underlying violation.

### 1. Underlying Violation

The FTC alleges that the HOPE Defendants violated the MARS Rule in at least three ways. First, they illegally accepted advance fees from clients in violation of 12 C.F.R. § 1015.5 ("It is a violation of this rule for any mortgage assistance relief service provider to ... [r]equest or receive payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer.") Second, they made material misrepresentations to their clients in violation of 12 C.F.R. § 1015.3, particularly regarding government affiliation, the terms of their modifications, and the nature of their trial payments. And third, they failed to make mandatory disclosures under 12 C.F.R. § 1015.4.

■ The FTC has presented substantial evidence proving that the HOPE Defendants violated the MARS Rule in the above ways. The record demonstrates that the HOPE Defendants failed to make mandatory disclosures, both over the phone and by mail, (UF 180; 181), that

they impermissibly represented to consumers that they were affiliated with the government and that consumers' payments were being held in trust for their lenders, (UF 82; 185), and that they illegally requested and accepted advance fees, (UF 95; 165; 194; 195). Lake offers no contrary evidence. Accordingly, the first element of MARS substantial assistance liability— that there be an underlying MARS Rule violation—is met.

### 2. Substantial Assistance or Support

■ The second element of liability under § 1015.6 is that the assister "provide substantial assistance or support" to a MARS provider who is violating the MARS Rule. "The threshold for what constitutes substantial assistance is low." *F.T.C. v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551(ILG)(RLM), 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012).[3] Although the substantial assistance standard is *not* met where a party provides only "casual or incidental help," help need not be "related to the commission or furtherance" of the offending practice in order to constitute substantial assistance. *F.T.C. v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) (identifying "cleaning a[n] ... office" and "delivering lunches" as conduct that would not support liability under the substantial assistance rule). Importantly, the FTC's MARS Rule Statement of Basis specifically identifies "back-end handling of consumer files" as a "critical support function" that could qualify as substantial assistance. (UF 25.)

■ The Court finds that the record easily establishes that Lake substantially assisted the HOPE Defendants. Lake concedes that he performed "back-end" pro-

---

**3.** *Consumer Health Benefits* arises in the TSR context, but the TSR's language on substantial assistance is identical to the MARS Rule's language, and neither party disputes that identical standards would apply in the two contexts.

cessing services on HOPE Defendant client files, (UF 25; 111), and that his outfit acted as a "back office" for the HOPE Defendants' operations, (UF 64). Lake contracted with the HOPE Defendants to interview clients and "advocate" for them with public officials and banks. (UF 73; 79; 97; 111.) This support was not "casual or incidental," *Chapman*, 714 F.3d at 1216–17. On the contrary, Lake played an integral part in the HOPE Defendants' scheme, because his "advocacy" on the back end meant that clients continued to make "trial payments" to the HOPE Defendants in the hope that they were actually getting something for their money. The record also demonstrates that Lake substantially assisted the HOPE Defendants by concealing the fact that the clients' advance fees were *not* being held in trust for the clients' banks, as the HOPE Defendants had represented. (Lake Dep. at 197:18–22; 201:14–19.) There is therefore no question that Lake's conduct constitutes "substantial assistance" under § 1015.6.

### 3. Knowledge or Conscious Avoidance

■ The final element of a violation of § 1015.6 is that the individual "know[ ] or consciously avoid[ ] knowing that the provider is engaged in any act or practice that violates [the MARS Rule]." This element is easily met here with respect to the HOPE Defendants' receipt of advance fees. Lake knew that the HOPE Defendants were accepting advance fees from consumers. (Lake Dep. at 182:5–13.) He also understood that the money went into a HOPE account and that he was paid a fee to handle the file. (*Id.* at 184:2–18.) Lake testified in his deposition that "the majority of companies" doing MARS work "keep[ ] some of the funds" they receive as advance fees, (*id.* at 181:18–182:13), and he testified that he would not begin working on a file he received from the HOPE De-

fendants until he was paid, (*id.* at 253: 15–21), despite knowing that the law "forbids the collecting of advance fees for anything relating to a modification," (*id.* at 252:12–25; *see also id.* at 201:14–19). And even if the Court were to credit Lake's current insistence that he did not know *exactly* how HOPE collected or kept fees, there is abundant evidence indicating that Lake deliberately looked the other way despite knowing that the other Defendants were "le[ading] people to believe [that their] payments were going directly to the bank," (Lake Dep. at 194:6–15). Lake refused to be "concerned" that "the majority of companies" in the MARS business were "keeping some of the [advance] funds" they received from consumers, (*id.* at 181:23–182:13), and he steadfastly refused to "have [a] conversation" with consumers about the location of the trial payments," some portion of which were actually sitting in Lake's very own bank account. (Lake Dep. at 199:6–22.) The Court therefore finds that this element is met.

In summary, Defendant Lake violated 12 C.F.R. § 1015.6 by lending substantial assistance to a MARS provider who was in violation of the MARS Rule. Summary judgment is therefore warranted on this issue.

### B. TSR Substantial Assistance Rule

■ The TSR prohibits a person from "provid[ing] substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c), or (d), or § 310.4." 16 C.F.R. § 310.3(b). Like the substantial assistance provision of the MARS Rule, the substantial assistance provision in the TSR has three elements: (1) there must be an underlying violation of the TSR; (2) the person must provide substantial assistance

or support to the seller or telemarketer violating the TSR; and (3) the person must know or consciously avoid knowing that the seller or telemarketer is violating the TSR.

### 1. Underlying Violation

■ The FTC alleges that the HOPE Defendants violated the TSR in at least three ways: by accepting fees while telemarketing after making a false statement, by making material misrepresentations while telemarketing, and by particularly misrepresenting material aspects of their refund policies while telemarketing. Each of these violations is well-established in the record, and Defendant Lake makes no effort at disputing them. The HOPE Defendants falsely represented to consumers that their payments would be held in trust for their lenders, (see UF 83; Lake Dep. at 165:9–169:4), and then subsequently took advance fees from those consumers, (UF 194), in violation of 16 C.F.R. 310.3(a)(4), which prohibits "[m]aking a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution." Second, the HOPE Defendants made material misrepresentations about the MARS services they sold, (UF 184; 185; 186; 188), in violation of 16 C.F.R. 310.3(a)(2)(iii), which prohibits misrepresenting "[a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." Finally, the HOPE Defendants misrepresented their refund policy, telling consumers that their payments would all be refunded if a modification fell through. (UF 196; 204.) This violated 16 C.F.R. § 310.3(a)(2)(iv), which prohibits misrepresenting "[a]ny material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies."

### 2. Substantial Assistance or Support

The substantial assistance standard for MARS violations is identical to the one for TSR violations. For the reasons discussed above in Section IV(A)(2), no reasonable jury could conclude that Lake did not substantially assist the HOPE Defendants in carrying out their scheme. Lake therefore substantially assisted them in violating the TSR.

### 3. Knowledge or Conscious Avoidance

■ As with the MARS Rule, it is beyond dispute that Lake knew or consciously avoided knowing that the HOPE Defendants were violating the TSR. He testified that he was "aware" that the HOPE Defendants' clients were making payments to HOPE and that those payments were not being held in trust for the banks, (Lake Dep. at 166:17–169:3). He also testified that the HOPE Defendants were leading clients to believe that they had been approved and that their payments were going to their banks, (id. at 194:6–21). That is enough to establish liability under the TSR, which prohibits "[m]aking a false or misleading statement to induce any person to pay for goods or services." 16 C.F.R. § 310.4(a). Fraud was the HOPE Defendants' business model, and Lake knew it. Nonetheless he continued contracting with them, continued to assist them in procuring payments from clients, (Lake Dep. at 179:20–181:17), and continued to refuse to inform customers about the location and use of their trial payments, (id. at 199:4–21).

In summary, Defendant Lake violated 16 C.F.R. § 310 by lending substantial assistance to a TSR seller who was in violation of the TSR. Summary judgment is therefore warranted on this issue.

### C. Monetary and Injunctive Relief

■ The final issue for the Court's resolution is what relief to award the FTC.

Under section 13(b) of the FTC Act, the FTC "may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b); *see also FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985). "This provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), including "any ancillary relief necessary to accomplish complete justice, *F.T.C. v. H. N. Singer*, 668 F.2d 1107, 1113 (9th Cir. 1982). "[R]estitution is a form of ancillary relief available to the court" in FTC cases. *F.T.C. v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001).

Here, the FTC seeks monetary relief in the full amount consumers paid to the HOPE Defendants ($2,349,885.00), a permanent injunction barring Lake from future violations of the MARS Rule and the TSR, and "fencing-in" relief, or a provision that "serve[s] to close all roads to the prohibited goal, so that [the FTC's] order may not be by-passed with impunity." *Litton Indus., Inc. v. F.T.C.*, 676 F.3d 364, 370 (9th Cir. 1982). The fencing-in relief the FTC seeks is a permanent injunction banning Lake from selling "secured or unsecured debt relief products and services," selling "mortgage-related financial products and services," "telemarketing," making any misrepresentation with regard to any financial product, making misrepresentations with regard to *any* products or services, and making unsubstantiated claims. (Dkt. 114 ("Proposed Order" at 9–13).)

### 1. Joint and Several Liability

The parties dispute whether Lake, as an assister, is jointly and severally liable for the *full* harm caused by both Lake and the HOPE Defendants. They have located only one case to confront the question directly—*FTC v. HESMerch. Servs. Co.*, Case No. 6:12-cv-1618-Orl-22KRS, 2015 U.S. Dist. LEXIS 28039, at *15 (M.D. Fla. Feb. 11, 2015). There, a district court held an assister jointly and severally liable for a total harm. Lake contends that *HES* was wrong to automatically apply joint and several liability, and that the Court should instead apply the federal common law of joint and several liability. That would require the Court to consider whether the harm effected by Lake and the other Defendants is "capable of apportionment," *Burlington N. & Santa Fe Ry. v. U.S.*, 556 U.S. 599, 606, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009). The Court need not resolve this dispute because even if it accepted Lake's argument that federal common law applied, it would still conclude that joint and several liability is appropriate. Lake says that he was given a fixed fee—$800 per file—and therefore that the harm is easily apportionable into his fixed fee and the remainder of the fee, which went to the HOPE Defendants. But this misconstrues joint and several liability. The question is not whether any *unjust enrichment* is capable of apportionment, as Lake argues, but whether any *harm* is. *See Burlington*, 556 U.S. at 607, 129 S.Ct. 1870 (asking whether the "harm caused by [defendants] was capable of apportionment"). Here, the harm to individual consumers varied based on how long they kept making trial payments to the HOPE Defendants. Lake's involvement on the back-end was crucial to keeping consumers in the scheme long enough to extract additional payments. It is impossible to say how much Lake actually harmed each individual—it was certainly at least the amount of his fixed fee, but in many cases it was certainly much more. As Lake persuaded consumers to stick around while he "advocated" for them with their lenders, their harm continued. That harm is not capable of apportionment, and the Court will therefore apply joint and several liability.

### 2. Amount of Monetary Relief

The FTC asserts that the full amount [4] consumers paid to the HOPE Defendants is $2,349,885.00. (UF 207.) Lake does not dispute this amount, nor that it is the proper measure of damages. However, the FTC does not present competent evidence that it is the proper figure. Uncontroverted Fact #207 announces that the figure is $2,349,885.00 and cites to the declaration of Emil George, a forensic accountant at the FTC. But Mr. George's declaration does not provide the $2,349,885.00 number. It says that the total amount the HOPE Defendants received from consumers was $2,104,031.56. (Dkt. 54-10, "George Decl." ¶ 9; *see also* George Decl. Attachment B.) The FTC provides two other record citations supporting UF 207, but one of them, "Meyer ¶ 10," apparently cites to a declaration that the Court cannot locate and which is cited nowhere else in the FTC's Statement of Uncontroverted Facts, and the other cites to Mr. Pacios's stipulation, where he stipulated that the amount consumer paid to the HOPE Defendants was $2,349,885.00.

The Court therefore only has two pieces of evidence on monetary relief before it: a declaration from an accountant averring that the actual figure differs from the FTC's figure by almost $250,000, and a stipulation from another defendant which does not explain how the figure was calculated. The Court cannot award monetary relief to the FTC which is unsupported by reliable evidence, even if Mr. Lake does not challenge the FTC's figure. As a result, the Court will award the figure in Mr. George's declaration—$2,104,031.56.

### 3. Injunctive Relief

A permanent injunction is justified if there exists "some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), or "some reasonable likelihood of future violations," *CFTC v. Co Petro Marketing Group, Inc.*, 502 F.Supp. 806, 818 (C.D. Cal. 1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982). The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct. *Co Petro Marketing Group*, 502 F.Supp. at 818; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations. *Murphy*, 626 F.2d at 655; *FTC v. Magui Publishers, Inc.*, No. 89-3818, 1991 U.S. Dist. LEXIS 20452 (C.D. Cal. Mar. 28, 1991).

The Court finds that a permanent injunction against Mr. Lake is appropriate under the circumstances to enjoin him from engaging in similar misleading and deceptive conduct. Mr. Lake has a considerable history of working in the mortgage business and for MARS fraudsters: prior to the events at issue in this case, he worked for Frank Barilla, an attorney who was later disciplined by the state bar for fraudulent mortgage practices, (UF 34–37), and he took work from National Advocacy Program, an entity which was illegally accepting advance fees from MARS consumers, (UF 50). He has also demonstrated an intent to continue working in the mortgage field; after JD United was

---

4. The full amount is the correct measure because "fraud in the selling ... entitles consumers ... to full refunds." *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993).

shut down, Lake obtained a "Mortgage Loan Originator License" and began working for Ladera Lending, selling mortgage loans to consumers. (UF 218–219.) Mr. Lake's actions in this case indicate that he cannot honestly market mortgage services to consumers, and the Court finds that he should be permanently enjoined from working in that business or in related businesses. *See F.T.C. v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081 ("[The FTC] cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal."). Finally, the record indicates that Mr. Lake feels something short of remorse for his wrongdoing. He testified in his deposition that he didn't believe it was his "fault" when homeowners "lost their homes and ... money," since those homeowners were "already behind on their mortgage" when he received their files. (Lake Dep. 201:20–202:9.) This callousness towards individuals he and the HOPE Defendants victimized is troubling, and it persuades the Court that there is a likelihood of future violations. The Court will therefore issue an appropriate injunction fencing-in Mr. Lake's future conduct. This was not Mr. Lake's first foray into the shadowy corners of mortgage servicing, and without action from the Court, it will likely not be his last.

Nonetheless, the FTC's proposed injunction is simultaneously benign, with several provisions basically amounting to enjoining Mr. Lake from breaking the law, and troublingly broad, requiring Mr. Lake to submit a "compliance report" to the FTC one year from the judgment, as well as update the FTC with certain information for *20 years*. The FTC's proposed injunction also includes provisions mandating that Mr. Lake maintain certain records, and submit additional "compliance reports" at its whim. "Mandatory injunctions are particularly disfavored" and are generally not granted "unless extreme or very serious damage will result." *Am. Freedom Def. Initiative v. King Cty.*, 796 F.3d 1165, 1173 (9th Cir. 2015). This Court does not wish to be in the business of refereeing compliance obligations the FTC would like to impose on Mr. Lake. Accordingly, the Court will issue a modified prohibitory injunction.

## V. CONCLUSION

For the foregoing reasons, the FTC's motion for summary judgment is GRANTED. The FTC shall submit a revised judgment and injunction consistent with this order no later than March 7, 2016.

DATED: February 24, 2016.