FILED
United States Court of Appeals
Tenth Circuit

December 14, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOHN T. BRAUN, M.D.,

        Plaintiff Counterclaim
Defendant - Appellee,

v.

MEDTRONIC SOFAMOR DANEK,
INC.,

        Defendant Counterclaimant -
Appellant.

No. 15-4173
(D.C. No. 2:10-CV-01283-RJS)
(D. of Utah)

**ORDER AND JUDGMENT**[*]

Before **KELLY** and **HOLMES** Circuit Judges.[**]

---

[*]      This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**]      The Honorable Neil Gorsuch heard oral argument in this appeal, but has since been confirmed as an Associate Justice of the United States Supreme Court; he did not participate in the consideration or preparation of this order and judgment. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal); *Murray v. Nat'l Broad. Co., Inc.*, 35 F.3d 45, 47–48 (2d Cir. 1994) (remaining two judges of original three-judge panel may decide petition for rehearing without third judge), *cert. denied*, 513 U.S. 1082 (1995).

## INTRODUCTION

This case arises out of a dispute over a licensing agreement between an inventor, Dr. John Braun, and a medical device manufacturer, Medtronic Sofamor Danek ("Medtronic"). Dr. Braun conceived a device and method to treat adolescent scoliosis—a severe deformity of the spine—less invasively than current surgical treatment, which fuses the vertebrae and transforms what is normally a flexible series of joints into a rigid rod. As consideration for the assignment of his intellectual property in the invention, Medtronic offered Dr. Braun a higher than typical royalty and upfront payment and committed itself to uncommon and costly human trials for the device, which were anticipated to be necessary to obtain Food and Drug Administration ("FDA") approval. But Medtronic instead attempted to obtain regulatory approval through a much less costly method, the 510(k) pathway, which does not require human trials, and never applied for permission to conduct human clinical studies. Dr. Braun, who over the course of about six years performed animal studies on his invention, became frustrated with the lack of development, and the relationship with Medtronic soured. This litigation resulted. At trial, Dr. Braun won an over $37 million dollar judgment, and Medtronic now appeals from the district court's disposition of its Rule 50 and 59 post-trial motions, and also contends that the jury verdicts are inconsistent.

For the reasons stated below, we **affirm** the district court's judgment in all

2

respects.

## I.  REGULATORY & MEDICAL BACKGROUND

Before narrating the facts of the case, some background on the FDA approval process for medical devices as well as on scoliosis and its treatment will be helpful.  Under the Medical Device Amendments of 1976, the FDA classifies medical devices according to the risk that they present, from Class I to Class III according to increasing degrees of risk.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 476–77 (1996).  Class III devices are those "that either 'presen[t] a potential unreasonable risk of illness or injury,' or which are 'purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health.'"  *Id.* at 477 (quoting 21 U.S.C. § 360c(a)(1)(C)).  To bring a Class III device to market requires premarket approval ("PMA"), which requires rigorous and substantial proofs of safety and efficacy.  *Id.*

Generally, to obtain PMA requires first obtaining an Investigational Device Exemption ("IDE"), which permits the device to be shipped for the limited purpose of human clinical trials to determine safety and efficacy.  *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1189 (10th Cir. 2007).  Human trials can be enormously costly, running into eight figures.  But not all Class III devices must run this gauntlet.

Devices marketed before 1976 were permitted to remain on the market

3

without PMA.  *Lohr*, 518 U.S. at 478.  The FDA also subjects devices substantially equivalent to grandfathered devices to less rigorous scrutiny. Section 510(k) premarket notification is a relatively brief and inexpensive process and has become the most common means for bringing to market Class III medical devices.  *See id.* at 477–79.  No clinical trials are required for 510(k) approval.

Scoliosis is a spinal deformity affecting 2% to 4% of the population, and 90% of scoliosis cases are idiopathic, that is, of unknown cause.  This disease mostly affects adolescents, hence the term "adolescent idiopathic scoliosis" ("AIS").  The other major variant of the disease is early onset scoliosis ("EOS"), which afflicts children under the age of 10.[1]  Treatment options are limited to observation, bracing (of limited effectiveness), and fusion surgery.  Fusion surgery is a "brutal[,] maximally invasive" procedure that "eliminates the spine as a spine and makes it a big, long, rigid segment."  App., Vol. XXIV, at 6129 (Tr., Test. of Dr. Braun, dated Feb. 20, 2014); *see also id.* at 6131 ("It's now like a femur in your back.").

Fusion surgery requires two steps.  First, hardware (typically rods and screws) are installed along the vertebrae to straighten the spine and hold it in place.  Next, the vertebrae are prepared for fusion.  This requires "rip[ping] the

---

[1]     EOS is subject to different treatment protocols and surgeries, which typically require regular surgery every six months to adjust the hardware installed along the spine to account for the child's growth.  *See* App., Vol. XXIV, at 6133.

surfaces off the bone" in order for the bone to heal "and form a bridge across all the segments" to which hardware was installed. *Id.* at 6130. This removal of the outer surface of the bone to reveal the interior "spongy bone, . . . the part that bleeds," results in serious pain and requires six months to heal. *Id.* In the long term, fusion prevents the growth of the spine, resulting in a shorter trunk and decreased lung function. It also causes long-term back issues in the unfused vertebrae below the fusion because the forces that the spine bears become concentrated on the disks of those vertebrae. Additionally, fusion results in massive scarring, and can result in psychological issues. Because of the drawbacks of fusion surgery, Dr. Braun and others have investigated less invasive ways of correcting scoliosis while also permitting the spine to continue to move. Fusionless scoliosis surgery aims to achieve these goals both by correcting the spine at the time of surgery and obtaining correction over time by redirecting the growth of the spine.

Generally, fusionless treatment involves the installation of hardware to the vertebrae which are then linked by some flexible material that can be tensioned to both provide correction and prevent further curvature. Various approaches to this treatment include staple, screw and tether (sometimes termed "anterior tether"), and anchor and tether—the last of which is Dr. Braun's invention.[2]

---

[2] The terms anterior and posterior are frequently used to describe whether the device is intended to be installed from the back (posterior)—a more

(continued...)

5

The theory behind Dr. Braun's bone anchor was to better integrate the fixture with the vertebrae by permitting bone to grow into the anchor, thus avoiding the loosening that often occurs over time with staples and screws—a real concern given the life expectancy of today's adolescents. Additionally, the shorter bone anchor was less likely than screws to cause complications such as severing a nerve or blood vessel. Finally, fusionless surgery would be appropriate for early intervention to prevent scoliosis from progressing to the point where full fusion was necessary.

## II. FACTUAL & PROCEDURAL BACKGROUND

Dr. Braun is an orthopedic surgeon who specializes in treating scoliosis and other spinal deformities and who served for a period in the U.S. Air Force prior to working at the University of Utah. While in the Air Force, Dr. Braun performed animal (specifically, goat) studies testing a staple fusionless treatment created by Dr. James Ogilvie; those studies were funded by Medtronic. They would become part of the basis for IDE trials for the staple treatment. Shortly after leaving the Air Force, Dr. Braun approached Medtronic to pitch his bone anchor concept for fusionless scoliosis surgery, and negotiations for a licensing agreement ensued.

At one point, Medtronic seemed to have had second thoughts about the contract. During a ski trip in which an agreement was to be executed, a

_____

[2](...continued)
invasive procedure—or through small incisions from the front of the body (anterior).

Medtronic representative, Michael Sherman, stated that he had forgotten to bring the contract and, in the weeks after, stated that there was no contract—and Dr. Braun began pitching his idea to other companies. However, the Medtronic sales team intervened, motivated by the fact that Dr. Braun was an important client, and a draft contract was soon offered.

The licensing agreement for Dr. Braun's invention was executed on March 17, 2000, by Dr. Braun, and on March 20, 2000, by a Medtronic representative. Most relevant here, the contract provided Dr. Braun with a $200,000 up-front payment, a promise of a $50,000 payment upon issuance of a patent, and a 5% royalty on net sales. Significantly, Medtronic bound itself to create and execute a development plan (outlined in an exhibit to the contract) and to "[p]repare file and conduct [sic]" an IDE and obtain PMA if necessary. App., Vol. XI, pt. 1, at 2721, 2743–44 (licensing agreement).

Dr. Braun testified at trial that these promises "may have been the biggest thing in this whole contract" because

> if a company commits to a study in a human trial that will cost 20, 30, 40 million dollars, that means they're putting skin in the game and it to me meant that they had a serious level of interest. That may have been the biggest part of the contract that made me interested in going forward with them eventually.

App., Vol. XXIV, at 6191–92. An internal document produced less than a year out from the contract revealed that Medtronic believed IDE to be necessary. The same document also showed that Medtronic intended to choose between Dr.

7

Braun's and another fusionless surgery option and have only one proceed to IDE.

Pursuant to the agreement, Dr. Braun began conducting animal studies—studies necessary to support an IDE application to the FDA—by inducing spine curvature in goats and then attempting to correct the curvature. At the same time, fusionless projects were identified as underfunded at Medtronic, and Medtronic documents show that between 2000 and 2006, little work was done except for Dr. Braun's animal studies. As late as 2006, a Medtronic document shows that the company had not budgeted resources even for related 510(k) filings on a screw and tether fusionless device ("Eclipse," a medical screw owned by Medtronic). The same document shows that funds had also not been budgeted for regulatory clearance and testing of any tether design.

Medtronic never pursued an IDE application for Dr. Braun's invention. At trial, Medtronic witnesses were unable to point to any budgeting of funds for regulatory activities outside of a 510(k) filing for a screw and tether device. But Medtronic itself had believed from early in the relationship that IDE would be necessary to bring Dr. Braun's invention to market. *See* App., Vol. XI, pt. 1, at 2797 ("Need IDE"). The FDA suggested as much as early as 2002 by rejecting a Medtronic 510(k) filing for a screw and tether device and expressly stating that IDE would be necessary. App., Vol. XIII, pt. 1, at 3188 (FDA letter rejecting 510(k) filing, dated Oct. 4, 2002) ("[W]e believe clinical data is necessary to determine whether the safety and effectiveness of your device is equivalent to a

8

legally marketed predicate device. . . . If collected in the US, the clinical data would need to be collected as part of an FDA-approved Investigational Device Exemption (IDE).").

Frustrated with this pace of development, Dr. Braun expressed his disappointment with Medtronic and repeatedly called for action to be taken as to regulatory development. As early as the end of 2006, Dr. Braun expressed his perception that Medtronic was not living up to its end of the bargain as to development. After continued contact through spring of 2007, Medtronic proposed that Dr. Braun exercise his buy-back option regarding the intellectual property covered by their agreement. However, in the end, Medtronic offered only reassignment of the patent that had been obtained, not to return the full extent of the intellectual property that Dr. Braun had licensed or transferred to Medtronic. *See* App., Vol. XI, pt. 1, at 2865; *see also* App., Vol. XXVI, at 6544 ("They were not going to give back my intellectual property. They were going to give back a very thin, waiver [sic] thin version of that in the anchor patent."). Dr. Braun brought suit against Medtronic in December 2010.

Before trial, Medtronic lost on a motion in limine to exclude the testimony of Dr. Braun's damages expert, Mr. Michael Collins, though the court stated that it would "consider a timely objection at trial if there's—if it turns out there just is not a sufficient foundation provided for this testimony at trial." *Braun v. Medtronic Sofamor Danek, Inc.*, 141 F. Supp. 3d 1177, 1182 (D. Utah 2015). At

trial, Medtronic did not object to the adequacy of the foundation for Mr. Collins's opinions.

Ultimately, the jury found that Medtronic had breached the agreement, had breached the implied covenant of good faith and fair dealing, had misappropriated Dr. Braun's trade secrets, and had fraudulently induced Dr. Braun into entering the contract, as well as finding that with respect to the fraudulent inducement claim, Medtronic's conduct "was the result of willful and malicious conduct, *OR* conduct that manifested a knowing and reckless indifference toward, and a disregard of, the rights of others"—a threshold issue for whether punitive damages could be awarded. App., Vol. II, at 358, 353–57 (emphasis added).

The jury awarded compensatory damages of $16 million for the breach of contract claims, nominal damages of $2 for the trade secret misappropriation claim, and $25,050,000 for fraudulent inducement. In a separate phase, the jury awarded $12 million in punitive damages on the fraudulent inducement claim. The court entered judgment in the amount of $37,050,002, in order to avoid overlapping damages on the contract and fraudulent inducement claims. *Braun*, 141 F. Supp. 3d at 1183.

Post-trial, Medtronic filed Rule 50(b) and Rule 59 motions, but both were denied. Many of Medtronic's sufficiency of the evidence arguments had been forfeited because they had not been made in Medtronic's Rule 50(a) motion. Moreover, many of its Rule 59 arguments were found forfeited by Medtronic's

10

failure to make a contemporaneous objection to Mr. Collins's testimony. Medtronic timely appealed.

### III. DISCUSSION

On appeal, Medtronic argues: (1) that the fact and amount of the compensatory damages award were against the clear weight of the evidence; (2) that the jury verdicts as to compensatory damages were inconsistent; and (3) that the punitive damages award must be set aside as unsupported by substantial evidence because Dr. Braun should have been required under Utah law to prove additional aggravating circumstances to support punitive damages. We address each argument in turn.

**A.     Challenges to the Fact of and Amount of Damages**

Medtronic asks this court to grant remittitur to $2.5 million (the reliance damages testified to by one of Dr. Braun's damages experts) or to grant a new trial on the basis that either Dr. Braun failed to present any evidence of the fact of lost profits damages or, in the alternative, that Dr. Braun's evidence as to the amount of damages was baseless and speculative. *See* Aplt.'s Opening Br. at 30–43. Dr. Braun, understanding these arguments as Rule 50 sufficiency of the evidence arguments, contends that they were waived because Medtronic failed to raise them in its Rule 50(a) motion. *See* Aplee.'s Br. at 34–40. We must first clarify the nature of Medtronic's arguments before examining whether they have been preserved for review.

11

Where it is unclear from an appellant's briefing whether an argument asserts error in the denial of a Rule 50 motion for judgment as a matter of law, or instead a Rule 59 motion for a new trial or to alter or amend the judgment, we look to the relief sought and other clues in the record to determine which decision of the district court is at issue. *Cf. M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 760–61, 762, 763, 764–65 (10th Cir. 2009) (holding, where briefing was unclear as to whether appellant sought review of Rule 50 or Rule 59 decisions, arguments were forfeited because not raised on a Rule 50(a) motion, and so, examining the arguments raised as arguments for new trial under Rule 59).

Although Medtronic and Dr. Braun both frequently speak of "sufficiency" of the evidence, it is clear from Medtronic's briefing that it seeks either a new trial or remittitur under Rule 59. *See* Aplt.'s Opening Br. at 30. Thus, Dr. Braun is incorrect to characterize these as sufficiency of the evidence arguments forfeited for failure to make them in a pre-verdict Rule 50(a) motion. *See* Aplee.'s Br. at 34–35. Understanding Medtronic's claims on appeal as claims relating to the district court's denial of its Rule 59 motion, we may now turn to the preservation issues raised by Dr. Braun.

### 1. Preservation

Medtronic's arguments challenging the district court's denial of its motion for a new trial or remittitur for lack of evidence on *the fact of liability* for lost

12

profits damages were not waived or forfeited. Medtronic adequately raised before the district court the arguments it now attempts to make here. *See* App., Vol. III, at 678, 687–696 (Medtronic's Alternative Mot. New Trial and/or Remittitur, filed Aug. 5, 2014). Indeed, the district court recognized and rejected Medtronic's arguments as to the fact of liability for lost profits damages. *See Braun*, 141 F. Supp. 3d at 1193.

However, we reach a different conclusion as to Medtronic's arguments as to the *amount of* damages. In its third argument in its Rule 59 motion—which primarily contended that Mr. Collins's testimony should have been excluded under *Daubert*—Medtronic urged in the alternative for remittitur because of the "lack of evidentiary support and the utterly speculative nature of Dr. Braun's measure of lost profits," but cited no law or facts to support this argument. App., Vol. III, at 696. Dr. Braun argues that this argument was either expressly waived for failure to make a contemporaneous objection to Mr. Collins's testimony, Aplee.'s Br. at 51, or that it was not independent of the argument for exclusion of Mr. Collins's testimony, *id.* at 51 n.33. In responding to these arguments, Medtronic asserts that the district court did not consider the argument waived but instead simply misunderstood its argument as related only to the admissibility of Mr. Collins's testimony on damages. *See* Aplt.'s Reply Br. at 4 n.2.

A theory for reversal that is not raised before the district court is ordinarily forfeited. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir.

13

2011).  More specifically, "vague, arguable references to [a] point in the district court proceedings do not . . . preserve the issue on appeal."  *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (quoting *Monarch Life Ins. Co. v. Elam*, 918 F.2d 201, 203 (D.C. Cir. 1990)); *see Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997).  "Briefly stat[ing] an alternative theory in [a] brief" is not the same thing as "develop[ing] that theory prior to [an] appeal"—the former "fail[s] to state [a] theory below with the required specificity" to be preserved for appeal.  *Tele-Comm'cns*, 104 F.3d at 1234; *accord U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (10th Cir. 2009) ("Nor may a party preserve an argument by making a 'fleeting contention' before the district court." (quoting *Tele-Comm'cns*, 104 F.3d at 1234)); *see also Muse v. United States*, 574 F. App'x 798, 800–01 (10th Cir. 2014) (unpublished) ("Rather than simply asserting before the district court that he and the Partnership had an equitable and beneficial interest in the policy, making the levy wrongful, it was Dr. Muse's job to identify Oklahoma authority supporting the existence of an equitable and beneficial interest in the policy and proceeds, and federal authority establishing that such equitable and beneficial interest exempted the proceeds from the reach of the tax lien.  Instead of furnishing such authority, he left it to the district court to determine the legal significance of his factual assertions.  Such inadequately developed arguments failed to preserve his resulting-trust issue for appeal."); *Chen v. Ashcroft*, 85 F.

14

App'x 700, 704–05 (10th Cir. 2004) (unpublished) (finding international law argument raised only in one "cursory paragraph" of proceedings below was "an undeveloped and secondary argument [that] is insufficient to preserve an argument on appeal").

Here, Medtronic's cursory remittitur argument as to the amount of the damages was presented in the context of a challenge to the district court's denial of Medtronic's *Daubert* motion—not in the setting of Medtronic's arguments that the verdict was against the clear weight of the evidence. *See* App., Vol. III, at 694–96. And whether a damages award is excessive or clearly against the weight of the evidence so as to justify remittitur is a question guided by state law, though subject to our federal standard of review, *see In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1209 (10th Cir. 2010)—as Medtronic recognizes on appeal, *see* Aplt.'s Opening Br. 36–43 (citing Utah law extensively). But Medtronic failed to present *any* Utah law below, leaving to the district court the task of divining the import of its *Daubert*-related arguments for the distinct question of whether the verdict was excessive or against the clear weight of the evidence. Furthermore, Medtronic does not argue for plain error review on appeal, which we have held "surely marks the end of the road for an argument for reversal not first presented to the district court." *Richison*, 634 F.3d at 1131. Medtronic's failure to develop this theory below with the necessary specificity constitutes forfeiture, and the failure to argue for plain error on appeal,

15

even in its reply brief, effectively waives the argument.[3]  *See id.*; *cf. United States*

*v. Zander*, 794 F.3d 1220, 1233 n.5 (10th Cir. 2015) ("We hold that Defendant

adequately addressed the issue of plain error review in his reply to the

government's brief, after arguing in his opening brief that his objections below

were sufficiently raised to be preserved for review on appeal.").

2.    *Merits*

Turning to the merits, "[w]e review for abuse of discretion a district court's

denial of a motion for new trial under Rule 59(a)."  *M.D. Mark*, 565 F.3d at 762.

Similarly, we review denial of a post-judgment motion for remittitur for abuse of

discretion.  *FTC v. Chapman*, 714 F.3d 1211, 1215 (10th Cir. 2013).  Indeed, the

standard for remittitur is "highly deferential":

> We review the district court's denial of [a] motion for remittitur
> or a new trial due to excessive damages under a highly

---

[3]      In its reply brief, Medtronic cites *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992), for the proposition that "parties are not limited to the precise arguments they made below."  *Yee* is not controlling in this context, however. First, the Supreme Court has left to the discretion of the courts of appeals "[t]he matter of what questions may be taken up and resolved for the first time on appeal."  *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).  While the rule of *Yee* may be appropriate for practice before the Supreme Court, with its unique, discretionary jurisdiction and singular role of clarifying the law—rather than review and correction of error—this court has historically understood its role more narrowly.  *See Parker Excavating, Inc. v. Lafarge West, Inc.*, 863 F.3d 1213, 1233 (10th Cir. 2017) (distinguishing *Yee* on this basis and observing that such an "extension of *Yee* would conflict with our 'long-standing practice' of reviewing newly raised legal arguments *only* under the plain-error standard" (emphasis added) (quoting *Richison*, 634 F.3d at 1128)).  Accordingly, Medtronic's attempt to use *Yee* to fend off the conclusion that it has forfeited its arguments not properly raised before the district court fails.

16

deferential standard, reversing only if we can discern a manifest abuse of discretion. Under this standard, the jury's award is inviolate unless we find it so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial.

*Therrien v. Target Corp.*, 617 F.3d 1242, 1257 (10th Cir. 2010) (quoting *M.D. Mark*, 565 F.3d at 766); *see also Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994) (stating the same, in response to a challenge to a denial of remittitur on the basis that the amount of the damage award was excessive and unsupported by the evidence). Defendants bear the "heavy burden of demonstrating that the verdict was 'clearly, decidedly, or overwhelmingly against the weight of the evidence.'" *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998) (quoting *Campbell v. Bartlett*, 975 F.2d 1569, 1577 (10th Cir. 1992)).

Under Utah law, "[t]he fact of damages must be proven with reasonable certainty." *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986). Reasonable certainty is "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered." *Kilpatrick v. Wiley, Rein & Fielding*, 37 P.3d 1130, 1146 (Utah 2001) (quoting *First Sec. Bank of Utah v. J.B.J. Feedyards, Inc.*, 653 P.2d 591, 596 (Utah 1982)). New businesses without "an actual record of past earnings . . . should be allowed to try to prove lost profits . . . by other means," including "by expert testimony." *Id.* (quoting *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1166 (Utah 1983)).

Medtronic essentially argues that Dr. Braun failed to prove the fact of lost

17

profits because he could not establish them to a reasonable certainty in light of the difficulties and vagaries of the FDA approval process. *See* Aplt.'s Opening Br. at 32–36. More specifically, Medtronic first argues that Dr. Braun offered no evidence that his goat studies were ready for submission to the FDA and, even if they were, he did not show any evidence that various intermediate steps between submission, approval, and success in the market place would have occurred. *See id.* at 32–35. Second, Medtronic argues that Dr. Braun's testimony conflicted with the "overwhelming record evidence that his idea was *not* ready for submission." *Id.* at 35. In this regard, such lost profits evidence must not be "so meager as to invite sheer speculation," but even if "imprecise" it must permit the jury to "base a damage determination on substantial, probative evidence." *Winsness v. M. J. Conoco Distribs., Inc.*, 593 P.2d 1303, 1306 (Utah, 1979); *see also id.* ("The law requires that this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference, leaving the damages to be determined by sympathy and feelings alone." (quoting 5 CORBIN ON CONTRACTS § 1022)).

By Medtronic's own admission, however, Dr. Braun testified that his studies were ready for submission, and, while that evidence may have conflicted with evidence put on by Medtronic, the jury was entitled to credit Dr. Braun's

18

testimony, as it evidently did.[4]  Nor is that the only record evidence upon which the jury could rely.  Medtronic had itself estimated the success of fusionless treatments at between 84%–86%.  Similarly, Medtronic's own revenue projections for fusionless relied on only a 13% discount rate, which incorporated various risks.  Indeed, Medtronic's own promise to develop and obtain approval for the device, cannot be understood as commercially sensible unless Medtronic had confidence that it would likely be able to obtain FDA approval and successfully market Dr. Braun's device.

We cannot say, based on this evidence, that the trial court abused its discretion in refusing to grant Medtronic a new trial or remittitur, particularly in light of the reasonable inferences the jury could have (and apparently) made in evaluating the evidence.  Medtronic would have us require that Dr. Braun prove in detail every step of a hypothetical approval process that never occurred.  But, as discussed above, Utah law does not require satisfaction of such an exacting

---

[4]     Medtronic's reference to a single witness's opinion that "'[i]t would have been futile to take' [Dr.] Braun's studies 'to the agency,'" is unavailing. Aplt.'s Opening Br. at 35.  That witness, Medtronic's FDA expert, Dr. Becker, was effectively cross-examined by counsel for Dr. Braun.  Cross-examination showed that her opinion was based on a review of very limited documents, App., Vol. XXIX, at 7428–29, and she admitted on cross-examination that the substance of the FDA's communications regarding Dr. Braun's tether device was that human studies would be needed before approval—*not* that the goat studies were without merit, *see id.* at 7431–34.  A single witness's contrary opinion—especially one like Dr. Becker's—simply does not "the overwhelming weight of the evidence" make.  The jury evidently resolved this conflict in favor of Dr. Braun.  We will not reconsider the jury's resolution on a cold record.

19

standard. Nor does Medtronic succeed in citing law to the contrary. Its citation

of *Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 744 (7th Cir. 2003) (Posner, J.),

relates to whether injunctive relief is appropriate, not whether, under Utah law,

lost profit damages are available where FDA approval is involved.

Further, unlike in *Canyon Country Store v. Bracey*, 781 P.2d 414, 419

(Utah 1989)—where "only preliminary contacts had been made concerning a

prospective trucking operation" and there was no proof that lost profits "were lost

due to the insurers' failure to pay under [a] policy," *id.*—here, Medtronic had

committed to developing Dr. Braun's invention and then chose not to. Notably,

Medtronic's concerns regarding the cannibalization of other Medtronic spinal

products by Dr. Braun's invention, App., Vol. XI, pt. 1, at 2796 (noting the need

to address cannibalization of "current instrumentation"), would presumably not

have played a factor in its decision-making had it not considered the marketability

of Dr. Braun's invention as a serious possibility, unlike the speculative trucking

operation of *Bracey*.

Under these circumstances, the district court did not abuse its discretion in

denying Medtronic's challenge as to *the fact of* lost profits damages.

## B. Inconsistent Damages Verdicts

"[T]o protect the jury's function, courts must 'reconcile the jury's findings,

by exegesis if necessary . . . .'" *Loughridge v. Chiles Power Supply Co.*, 431 F.3d

1268, 1275 (10th Cir. 2005) (quoting *Johnson v. Ablt Trucking Co.*, 412 F.3d

20

1138, 1143 (10th Cir. 2005)). This means that a reviewing court "must accept any reasonable view of the case that makes the jury's answers consistent." *Id.* We must affirm on any "plausible theory that supports the verdict." *Johnson*, 412 F.3d at 1144. Yet, we may not "invade the province of the jury by disregarding factual findings." *Id.* If the jury's findings "are irreconcilably inconsistent, the court cannot enter judgment without choosing between the conflicting findings of fact and thereby overturning one of them." *Id.* And this it cannot properly do.

"Irreconcilably inconsistent" means that the "jury's answers must be 'logically incompatible, thereby indicating that the jury was confused or abused its power.'" *Id.* (quoting *Stone v. Chicago*, 738 F.2d 896, 899 (7th Cir. 1984)). This occurs only when "the essential controlling findings are in conflict [and] the jury has failed utterly to perform its function of determining the facts, and its verdict is a nullity." *Id.* (quoting Abner Eddins Lipscomb, *Special Verdicts Under the Federal Rules*, 25 WASH. U. L.Q. 185, 212 (1940)). Irreconcilable inconsistency consists of a situation where, for example, a jury finds both that a defendant committed no negligence but nonetheless also finds "that the defendant's negligence caused the plaintiff's injuries." *Id.*

Medtronic argues that the damages verdicts are irreconcilably inconsistent because the damages theories for fraudulent inducement and breach of contract were the same but the jury awarded $9 million more on fraudulent inducement than on breach of contract: $16 million for breach of contract but $25 million for

21

fraudulent inducement. *See* Aplt.'s Opening Br. 43. Dr. Braun retorts that this issue must be reviewed at most for plain error, because the verdict delivered was a general verdict with interrogatories and Medtronic failed to object before the jury was dismissed. *See* Aplee.'s Br. 53.

Dr. Braun further argues that the damages verdicts are not inconsistent in that they can be explained by any one of three factors: (1) the jury could have understood breach of contract damages to be limited to $16 million, the value of Dr. Braun's invention in the United States, insofar as Medtronic did not make express promises of worldwide development and, lacking that promise, Dr. Braun could not expect additional royalties under the contract; (2) the jury could have considered Dr. Braun to have had a duty to mitigate under the contract as early as 2002 but Medtronic never argued for mitigation under the fraudulent inducement theory, perhaps in part because no duty could arise prior to Dr. Braun discovering the fraud in 2007; and (3) damages for fraud are measured at the time of inducement while contract damages are measured at the time of breach. *See id.* at 53–57. Medtronic responds that fraudulent inducement damages cannot be for $25 million because under Utah law, a fraud plaintiff's measure of damages requires the election of either the position it would have been in had it rescinded or else to seek damages by affirming the contract in order to receive the benefit of the bargain had the counterparty's misrepresentations been true. *See* Aplt.'s Reply Br. at 16.

22

We need not address the parties' arguments as to whether the verdict in question was special or general and the effect that this would have on our standard of review. This is because even assuming *arguendo* the verdict was special and our standard of review is de novo—i.e., the standard that Medtronic favors—a plausible explanation exists for the alleged inconsistency. Therefore, Medtronic's challenge fails.

Any plausible explanation for the divergence between the two damages verdicts hinges on the $9 million difference between the two. If that figure can be plausibly accounted for, then the verdicts are not irreconcilably inconsistent. We begin with the testimony of Dr. Braun's damages expert.

Mr. Collins estimated that the present value of U.S.-only royalty streams would be $16 million, while total royalty streams would constitute $25 million—a difference of $9 million. Mr. Collins also stated on cross-examination that his measure of Dr. Braun's lost profits on the fraudulent inducement claim was based on "lost value that [Dr. Braun] could have obtained from somewhere else. My opinion of that value is $25,000,000." App., Vol. XXVIII, at 7088; *see generally id.* at 7086–89. Similarly, Mr. Collins testified that $25,000,000 would be the measure of breach of contract damages.

In the course of his testimony, Mr. Collins consistently stated that there were two different measures of lost profits, although both amounted to $25 million: (1) a lost value measure, applicable to fraudulent inducement; and (2) a

23

lost royalty measure applicable to breach of contract based on Medtronic having performed under the contract. In other words, while the two measures of damages had the same dollar value based on the promises that Medtronic made, they nonetheless constitute two distinct measures.

The difference in the two verdicts then arises, as Medtronic concedes, from the fact that the jury found that "Braun's expectancy under his bargain with Medtronic was limited to $16 million in domestic royalties (as the jury found)." Aplt.'s Reply Br. at 17. And the jury could have so found on the theory that Medtronic had not bound itself to develop the product outside of the United States. For instance, whereas Medtronic expressly bound itself as to U.S. development and set out specific milestones for that development, *see* App., Vol. V, at 1215; *id.* at 1237–38 (Exhibit B to License Agreement, Braun Fusionless Scoliosis Development Plan) (concerning only U.S. development), Medtronic bound itself only to more vague "*worldwide*, marketing, sales and distribution . . . after receipt of appropriate U.S. and foreign regulatory approvals to market and sell." *Id.* at 1215 (emphasis added). Further, obtaining patent applications outside of the United States was expressly at Medtronic's "sole discretion and expense." *Id.* at 1217. Outside of the United States, Dr. Braun even had the option to pursue patent filings on his own.

"It is not metaphysically impossible" that the jury could find that damages for breach of contract amounted to only $16 million while the lost value measure

24

of damages for fraudulent inducement totaled $25 million.  *Johnson*, 412 F.3d at 1144.  The instructions given to the jury stated only that Dr. Braun "claims lost profits that he might have earned but for Medtronic's conduct[;]" the instructions did not define how lost profits were to be measured.  App., Vol. II, at 326 (Jury Instructions, filed Mar. 1, 2014).  Rather, the instructions stated the jury might "use any formula or theory for determining damages which is based upon the evidence in the case and which you believe to be reasonable."  *Id.*  Under these instructions, the jury's verdict was not irreconcilably inconsistent.[5]

---

[5]      Medtronic's response that Dr. Braun forswore rescissionary damages in favor of an affirmation theory appears to stem from confusion as to the meaning of these terms and their relevance.  Aplt.'s Opening Br. at 45. As Medtronic rightly points out, under Utah law, "[t]he plaintiff in an action for fraud has the option to elect to rescind the transaction and recover the purchase price or to affirm the transaction and recover damages."  *Dugan v. Jones*, 615 P.2d 1239, 1247 (Utah 1980), *rec'd as superseded on other grounds by Arnold v. Curtis*, 846 P.2d 1307, 1309–10 (Utah 1993).  In the latter case, an affirmation theory, the plaintiff seeks "the difference between the value of the property purchased and the value it would have had, if the representations were true, viz., the benefit of the bargain rule."  *Id.*  Lastly, there is also the concept of rescissory or rescissionary damages, where damages are used as a substitute for rescission because rescission is no longer possible but the appropriate remedy is to return the plaintiff to the status quo ante.  *See Rescissory Damages*, BLACK'S LAW DICTIONARY (10th ed. 2014).

In effect, Medtronic confounds the Utah law measure of fraud damages with a rescissory theory of damages.  Medtronic proceeds with the understanding that Dr. Braun "disclaimed a rescission theory that would have awarded the profits he supposedly could have obtained by contracting with another company." Aplt.'s Opening Br. at 31 n.4.  But under Utah law, damages for fraud "can be measured as the difference between the value received as a result of the fraud and the fair value that would have been received 'had there been no fraudulent conduct,'" *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1164 (10th Cir.

(continued...)

25

## C. Punitive Damages

Medtronic's final argument is that the punitive damages award cannot stand as a matter of law and should be set aside or, in the alternative, that the district court erred in its jury instructions on the availability of punitive damages and a new trial is required. *See* Aplt.'s Opening Br. 48–59. Specifically, Medtronic's argument rests on three key premises: first, that under Utah law a plaintiff must show aggravating circumstances if the threshold (i.e., minimum) elements necessary to establish liability for the tort would automatically establish the

---

[5](...continued)
2013) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972)) (construing Utah law). This corresponds to the lost-value measure testified to by Mr. Collins. In short, Medtronic seems to understand Mr. Collins's fair value measure to be an attempt to undo the transaction and receive hypothetical profits from a third party, rather than an attempt to ascertain the value of the invention at the time of the deal.

A closer look at the portions of the record cited by Medtronic shows that Dr. Braun did not decline to seek this measure of fraud damages, but declined only "rescission." *See* App., Vol. III, at 540 (Pl.'s Resp. to Def.'s Obj. to Pl.'s Proposed J., filed Mar. 21, 2014) ("No rescission remedy was sought or obtained and the jury was not instructed with regard to rescission. Rather, Dr. Braun pursued *damages* only. Specifically, Dr. Braun did *not seek a return* of the intellectual property he conveyed to [Medtronic] because, among other reasons, *the value* of that intellectual property had already been wasted by [Medtronic] . . . ." (first emphasis added)); App., Vol. VII, at 1642 (Pl.'s Mem. Opp'n to Medtronic's Renewed Mot. JMOL, filed Oct. 29, 2014) ("[T]he jury's award of $25,050,000 fit the evidence presented precisely because while the *present value of the Invention was shown to be $25,250,000*, Dr. Braun received and did not return to Medtronic $200,000 . . . .") (emphasis added). Thus, the record does not bear out Medtronic's objection.

26

prerequisites for punitive damages; second, that this circumstance is present here as to Dr. Braun's claim for fraudulent inducement, which has a minimum scienter element of recklessness; and third, that Dr. Braun has not demonstrated the required aggravating circumstances. *See id.* at 48–55.

Dr. Braun replies first that the cases that Medtronic relies on to support its ostensible aggravating circumstances requirement are "inapposite" because they arise solely in the context of torts with a "willful and malicious" scienter element. Aplee.'s Br. at 57 n.42. Further, he contends, in effect, that any aggravating circumstances requirement would not be applicable here in any event because there is no overlap between the minimum recklessness required to support liability for fraudulent inducement and the "knowing and reckless indifference toward, and a disregard of, the rights of others" necessary for punitive damages. Aplee.'s Br. at 63–64. In other words, under the logic of Dr. Braun's argument, establishing the recklessness necessary for liability for fraudulent inducement would not automatically establish liability for punitive damages under the "knowing and reckless indifference" standard; therefore, the circumstance triggering application of any purported aggravating circumstances requirement is not present here.

### 1. *Denial of Judgment as a Matter of Law*

We review "de novo a district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Harsco Corp. v.*

27

*Renner*, 475 F.3d 1179, 1185 (10th Cir. 2007). To reverse, the evidence must "point[] but one way and [be] susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* "We do not however, 'weigh the evidence, pass on the credibility of witnesses, or substitute [our] conclusions for that of the jury.'" *Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1110–11 (10th Cir. 2005) (quoting *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1279 (10th Cir. 2003)). Additionally, we "view[] the facts in the light most favorable to [the nonmovant]." *Renner*, 475 F.3d at 1186. But an award of punitive damages "must be set aside if the court determines that the issue should not have been submitted to the jury in the first place." *Jackson v. Pool Mortg. Co.*, 868 F.2d 1178, 1182 (10th Cir. 1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072–73.

*a.*

In light of this standard of review, we first determine the legal question of what is required under Utah law for an award of punitive damages before examining whether substantial evidence supported the punitive damages award. In deciding issues of state law, we "look to the rulings of the highest state court" and, in the absence of such rulings, "must endeavor to predict how that high court would rule." *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007).

Utah requires by statute that

28

punitive damages may be awarded only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests *a knowing and reckless indifference toward, and a disregard of, the rights of others*.

Utah Code Ann. § 78B-8-201(1)(a) (emphasis added). Medtronic depends heavily on *Nelson v. Jacobsen*, 669 P.2d 1207 (Utah 1983), and scattered cases following *Nelson* for the argument that a finding of aggravating circumstances is required. *See* Aplt.'s Opening Br. 48–50. In *Nelson*, the Utah Supreme Court held that

to recover punitive damages for the tort of alienation of affections the plaintiff must show "circumstances of aggravation in addition to the malice implied by law from the conduct of defendant in causing the separation of plaintiff and [his or her spouse] which was necessary to sustain a recovery of compensatory damages."

669 P.2d at 1219 (quoting *Heist v. Heist*, 265 S.E.2d 434, 527 (N.C. Ct. App. 1980)). It focused on "the fact that the elements of willfulness and maliciousness are, in effect part of the cause of action for alienation of affections." *Id.* The rationale for this holding was that otherwise "punitive damages [would be] automatically available in every such cause of action." *Id.*

Not only is *Nelson* distinguishable, but arguably it has been superseded by later decisions of the Utah Supreme Court and by statute. First, *Nelson* predates the enactment of the Utah statute governing the showing required for punitive damages. *See* 1989 Laws of Utah, ch. 237, § 1 (originally codified at Utah Code Ann. § 78-18-1, before being renumbered as § 78B-8-201). Further, *Nelson*'s

29

requirement of additional aggravating circumstances has not been cited by the Utah Supreme Court since *Nelson*. Indeed, *Nelson*'s rule appears to have last been applied in a Utah state court by the Utah Court of Appeals in 1997. *See ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 260 (Utah Ct. App. 1997) (applying rule to tort of interference with prospective contractual relations for improper purpose because "improper purpose . . . inherently includes malicious intent" and, absent requiring additional aggravating circumstances, punitive damages would automatically be available), *overruled on other grounds by Eldridge v. Johndrow*, 345 P.3d 553 (Utah 2015).

Since then, the only cases to have relied on the rule are federal—specifically, *Trugreen Cos. v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937 (D. Utah 2007), and a nonprecedential decision of this court in *Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 408 F. App'x 162 (10th Cir. 2011) (unpublished); *see also* Aplt.'s Opening Br. at 49–50; Aplt.'s Reply Br. at 21–22 (citing those four cases). The two federal cases, and the Utah Court of Appeals decision in *ProMax*, are not binding on us of course; at best, they are persuasive authority.

After surveying the legal landscape, we ultimately predict that the Utah Supreme Court would conclude that—if *Nelson* has continuing vitality at all—it at best stands for the proposition that the additional aggravating circumstances standard applies *only* where the requisite scienter for the tort at issue is "willfulness" and "maliciousness"—as with the torts of alienation of affection and

30

interference with prospective contractual relations for improper purpose. Indeed, Utah courts have never applied the doctrine outside that context.

This narrow reading of the aggravating circumstances doctrine is supported by more recent Utah Supreme Court cases that analyze the question of punitive damages without requiring additional aggravating circumstances for torts that do not themselves have as an element willful and malicious conduct. *See, e.g.*, *Daniels v. Gamma W. Brachytherapy, LLC*, 221 P.3d 256, 269 (Utah 2009) (distinguishing the gross negligence or recklessness required for the underlying tort claim and the recklessness along with knowledge of the danger to the plaintiff required for punitive damages—without requiring additional aggravating circumstances); *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 807 (Utah 1991) (ruling that fraud with "reckless disregard of [plaintiff's rights]" was sufficient to support punitive damages, where "jury properly found intentional fraud," —without engaging in additional aggravating circumstances analysis). This reading of *Nelson* is further supported by Utah Supreme Court decisions between *Nelson* and the enactment of the punitive damages statute in 1989.

In 1988, the Utah Supreme Court explained the development of its punitive damages jurisprudence, citing in particular two cases from 1985, both of which require "knowing or reckless indifference toward, and, disregard of, the rights of others" or "willful and malicious" conduct before punitive damages may be awarded. *Johnson v. Rogers*, 763 P.2d 771, 774 (Utah 1988) (quoting first

31

*Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1112–13 (Utah 1985); then quoting *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 337 (Utah 1985)). As can be seen at a glance, this language mirrors that which the State of Utah enacted into law in 1989 and that is still in force in Utah Code Ann. § 78B-8-201(1)(a), suggesting that the statute was intended to codify the rule of those cases. In light of the foregoing, we predict that any continuing vitality that *Nelson* has is limited to torts that have as an element willful and malicious conduct, so as to prevent automatic imposition of punitive damages for such highly culpable torts.[6] Therefore, fraudulent inducement clearly would not fall under this rule, because it does not require—at a minimum—conduct animated by such scienter to establish liability. *See, e.g.*, *Pace v. Parrish*, 247 P.2d 273, 275 (Utah 1952) (noting, as relevant to the scienter element, that "an action in deceit based on fraudulent misrepresentations" *at least* requires a showing, *inter alia*, that the representation "was false" and "the representor made [it] recklessly, knowing that he had insufficient knowledge upon which to base

---

[6] Medtronic suggests that we certify to the Utah Supreme Court whether the additional aggravating circumstances analysis applies to fraud claims. But *Nelson* and *ProMax* are sufficiently distinguishable from the present case— particularly in light of the more recent Utah Supreme Court cases—that certification to the Utah high court is not necessary. *See Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007) ("Under our own federal jurisprudence, we will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves."). Nor does Medtronic attempt to address the standard found in our caselaw for assessing whether certification is appropriate.

such representation").

*b.*

As noted, Dr. Braun essentially argues that any aggravating circumstances requirement would not be applicable here in any event because there is no overlap between the minimum recklessness required to support liability for fraudulent inducement and the "knowing and reckless indifference toward, and a disregard of, the rights of others" necessary for punitive damages. Aplee.'s Br. at 63–64. We agree.

Specifically, Dr. Braun correctly contends that there is a distinction between the recklessness necessary for a finding of fraud liability and that required for punitive damages. *See* Aplee.'s Br. at 63–64. Medtronic replies that this contention fails to take account of the fact that, in Utah, fraud for a reckless misrepresentation requires "knowing that there was insufficient knowledge upon which to base such a representation." *See* Aplt.'s Reply Br. at 22 & n.15. While the premise of Medtronic's argument is correct—for a reckless misrepresentation to result in liability, it must be made "knowing that there was insufficient knowledge upon which to base such a representation," *Keith v. Mountain Resorts Dev., L.L.C.*, 337 P.3d 213, 225 (Utah 2014)—the conclusion is not. *Daniels v. Gamma West Brachytherapy* makes clear why.

*Daniels* establishes that the statutory knowing and reckless disregard required for punitive damages means that the defendant must have actual

33

knowledge "of the danger of his or her action or inaction." 221 P.3d at 269. The legislature expressly added this language "to require 'the plaintiff [to] prove actual knowledge by the defendant of the danger created by the defendant's conduct.'" *Id.* (quoting Utah Senate Journal, 48th Leg., Gen. Sess. 705 (Feb. 21, 1989) (statement of Senator Barlow)). Although *Daniels* sets out this definition of "knowing and reckless indifference toward, and a disregard of, the rights of others," in order to show that a claim for gross negligence requires showing not only recklessness but the knowledge of the risk incurred, *id.*, this definition nonetheless distinguishes the statutory requirement for punitive damages from the reckless and knowing misrepresentation that is required for fraudulent inducement liability.

Put more plainly, there is a distinction between recklessness with respect to the truth or falsity of a representation while knowing that there is insufficient knowledge to support the representation and reckless disregard of the known harm that could come to another because of such a misrepresentation. The former relates to a fraudster's knowledge of her lack of knowledge upon which to base a representation or, in other words, the knowledge of a serious risk that her representation will be false—this recklessness turns on the risk of falsity. The latter relates to the fraudster's knowledge of the risk of harm that may come about by a fraudulent representation—this recklessness turns, not on the risk of falsity, but the risk of harm to others and their rights. In other words, knowing that one

34

lacks a basis for a representation is distinct from the knowledge of the risk of harm that may result from that misrepresentation. Fraud requires the former; punitive damages requires the latter.

Because these are distinct forms of recklessness, an award of punitive damages is not automatic upon the establishment of the recklessness required—as a minimum threshold—for liability for fraudulent inducement; accordingly, the basis for the application of the ostensible aggravating circumstances standard is not present. In other words, Medtronic is mistaken in asserting that absent an additional aggravating circumstance requirement, "punitive damages would be available in *every* fraudulent inducement case" because the minimum scienter requirement for fraudulent inducement actually would not overlap with a scienter that is sufficient for an award of punitive damages. Aplt.'s Opening Br. at 53.

Medtronic fails to support its position to the contrary with legal authority. *See* Aplt.'s Reply Br. at 22 & n.15. Further, although *Daniels* was clearly cited in Dr. Braun's brief, Medtronic fails to cite it, much less attempt to defuse that case's definition of the statutory knowing and reckless disregard required for punitive damages. Medtronic simply stands on its position that the recklessness necessary to establish fraudulent inducement must be coupled with an aggravating circumstance, otherwise punitive damages would always be available where liability for fraudulent inducement is found. *See* Aplt.'s Opening Br. at 52–53. But this argument rests on the premise that the statutory recklessness required for

35

punitive damages is the same as recklessness required for fraudulent inducement liability—a premise we have already shown to be mistaken.[7]

*c.*

Applying Utah law, the punitive damages verdict must stand unless, in the light most favorable to Dr. Braun and drawing every reasonable inference in his favor, we are unable to find that Dr. Braun produced sufficient evidence to support the punitive damages award. Under this standard, we discern no basis to disturb the jury's punitive damages verdict. Specifically, we conclude that Dr. Braun presented sufficient evidence that Medtronic acted with at least *a knowing*

---

[7] Dr. Braun argues that Medtronic's argument in this regard has been waived because it was not presented to the district court, where Medtronic argued that aggravating circumstances are required for both intentional and reckless fraud. Aplee.'s Br. at 57–58; *see also Braun*, 141 F. Supp. 3d at 1190 ("Medtronic argues that where an underlying claim (such as fraudulent inducement in this case) 'includes willful, malicious, or fraudulent intent as an element,' this same element cannot also serve as the aggravating circumstances that permit the jury to award punitive damages."). But our waiver and forfeiture doctrine is, at bottom, discretionary. *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013). And given that Medtronic asks us to review the district court's denial of its motion for judgment as a matter of law—which we review de novo—we feel free to avail ourselves of the parties' briefing on the antecedent question of what was legally required for punitive damages under Utah law. *Cf. Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014) ("'[W]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.' . . . 'A court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief.'" (quoting *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446–47 (1993))).

*and reckless indifference toward, and a disregard of, the rights of others.* Utah Code Ann. § 78B-8-201(1)(a) (emphasis added).

The licensing agreement with Dr. Braun was executed on March 17, 2000, by Dr. Braun and three days later by Medtronic. Medtronic made extraordinary promises to Dr. Braun, particularly the promise of costly IDE trials, *see* App., Vol X, pt. 1, at 2561–62 (dep. tr. of Jon Serbousek, former Medtronic VP) (testifying that he was unable to recall another contract where Medtronic had committed itself to IDE), *and* an exceptionally high royalty rate compared to other spinal and fusionless projects, *see* App., Vol. XI, pt. 1, at 2784; *see also id.*, Vol. X, pt. 1, at 2569–70 (observing "how rich" and "big" the royalty promised to Dr. Braun was).

However, less than eight months after the ink had dried on the licensing agreement, Medtronic documents show that the company did not want to make good on its commitment to develop Dr. Braun's invention and instead his invention would be pitted against the screw and tether product with only the "Best Tether Option" going forward to IDE human trials. App., Vol. XI, pt. 1, at 2799; *see also id.* at 2796 ("What concepts do we move forward with? . . . Does market opportunity justify the cost of IDE? . . . How do we address cannibalization of current instrumentation?"). And a mere year after signing the agreement, another document states that, for Dr. Braun's invention, a "510(k) pathway will be determined following the results of Staple and Tether 510(k) applications." *Id.*, pt. 2, at 2901 (Fusionless Scoliosis Project Plan, dated Mar. 12, 2002). That

37

document goes on to lay out a series of steps, starting with getting an IDE study for a staple product, followed by a study for the Eclipse Tether, but no plans are laid out for IDE for Dr. Braun's invention. *Id.* at 2905.

Even more telling as to Medtronic's intent *not* to develop Dr. Braun's device as promised is the absence of detailed financial projections. That Medtronic never undertook such projections to evaluate the financial prospects for Dr. Braun's invention before making such extravagant promises suggests that Medtronic was at least reckless as to whether it would be economically reasonable for Medtronic to in fact develop Dr. Braun's invention. Thus, a jury could infer that Medtronic made such promises to keep Dr. Braun's invention out of the hands of its competitors, knowing that there was a serious risk—having succeeded in acquiring Dr. Braun's intellectual property—that development of his invention (as promised) would never proceed. *See id.*, Vol. XXVI, at 6642 (tr. of testimony of Steven Brendt Adamson, former Medtronic sales representative involved in the transaction) ("Was Medtronic concerned about Dr. Braun potentially taking his ideas to another company? A. Yeah, it was a cutting edge thought process, really a game changer in how you treat scoliosis and the product. Absolutely we were scared about that."). Taken together, the evidence was sufficient for the rational juror to infer that Medtronic was at least *reckless with respect to the harm* that its misrepresentations might cause Dr. Braun, in particular that the company might never develop the invention, thus depriving Dr. Braun of royalties

38

and the other benefits of Medtronic's promise to develop the invention.

### 2.    *Denial of Motion for a New Trial*

Having determined that the recklessness required for liability for fraudulent misrepresentation is distinct from the knowing and reckless disregard for the rights of another necessary for punitive damages, Medtronic's claim of instructional error also fails. "We review de novo legal objections to the jury instructions." *Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012). Jury instructions must "fairly, adequately and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them." *Id.* at 1154-55 (quoting *United States v. Barrera-Gonzales*, 952 F.2d 1269, 1272 (10th Cir. 1992)). Instructions need not be "flawless," but they must not "misle[a]d in any way." *Id.* at 1155.

We have already determined that the additional aggravating circumstances analysis that Medtronic requested is not applicable in this case. And the jury instructions properly distinguished between the recklessness required for fraudulent inducement, App., Vol. II, at 303 ("A false statement is made recklessly if Medtronic knew that it did not have sufficient knowledge to make the statement."), and that required for punitive damages, *id.* at 341 ("Medtronic's conduct manifested a knowing and reckless indifference toward, and a disregard of, the rights of others . . . . An entity acts with knowing and reckless disregard

when it knew of a substantial risk and proceeded to act or failed to act while consciously ignoring that risk."). Therefore, we conclude that the jury instructions were not erroneous.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.[8]

---

[8] Medtronic filed a motion to file a sealed appendix, and Dr. Braun opposes it in part. Medtronic states that it has reviewed the documents that were sealed below and seeks only to file under seal those documents whose disclosure would harm its competitive interests. Mot. to File Sealed App. at 2–3. Even a cursory review of the documents in question confirms that they do contain sensitive, proprietary information concerning Medtronic's business practices and potentially sensitive technical and financial data. Indeed, much of the information in the documents is highly detailed and specific technical and financial information about Medtronic's spinal products in development. For most of the documents in question, we see no reason why they should not be sealed.

But some of the documents were presented at trial as exhibits—these present a closer question. To some extent, as trial exhibits, they have already entered into the public record. Despite this, the district court continued to take care that such exhibits and sealed portions of the trial transcripts be filed under seal when attached to post-trial motions. Although *United States v. Pickard*, 733 F.3d 1297, 1305 (10th Cir. 2013), suggests that under certain circumstances information that has been made public at trial should be unsealed on appeal, a practical distinction nevertheless exists between a document physically introduced into the court's public record at one point in time, and then subsequently kept under seal, and a document made perpetually available for all the world to see on the court's electronic docketing system. Here, the district court chose to continue to permit trial exhibits accompanying post-trial motions to be filed under seal, and we may properly draw a similar line. While it is true, as Dr. Braun points out, that a district court's decision to seal a document is not in itself good cause to seal a document on appeal, *see JetAway Aviation, LLC v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 826–27 (10th Cir. 2014) (per curiam), we do not blindly follow the district court's lead here. Though we may properly take notice of the district court's handling of the documents at issue, the central basis on appeal for our

(continued...)

40

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

---

[8](...continued)
decision to seal them is that we independently recognize that they contain information that is highly sensitive and of a proprietary nature. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (holding that "business information that might harm a litigant's competitive standing" can constitute a sufficient reason to preserve records under seal). Accordingly, we **GRANT** in full Medtronic's motion to file a sealed appendix.

Dr. Braun also filed a motion to strike footnote 2 of Medtronic's reply brief because it allegedly contained inaccurate statements and presented a new preservation argument. We **DENY as moot** this motion because it is unnecessary for this court to decide the motion in order to properly decide the preservation issue—more specifically, to reach a decision under the law that is adverse to Medtronic. *See supra* Section III.A.1 (discussing waiver of Medtronic's argument as to the amount of damages).